# IN THE UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

IN RE:  **IRONWOOD FINANCIAL, LLC**  **CHAPTER 11**
        Debtor                        **CASE NO. 21-10866-JDW**

## EMERGENCY MOTION FOR AUTHORITY TO USE
## CASH COLLATERAL AND FOR GRANTING ADEQUATE PROTECTION

COMES NOW Ironwood Financial, LLC (the "Debtor" or "Ironwood") and files this its Emergency Motion for Authority to Use Cash Collateral and for Granting Adequate Protection (the "Motion"), and in support thereof would respectfully show as follows, to-wit:

### Introduction

1. On May 3, 2021 (the "Petition Date"), the Movant filed with this Court its Voluntary Petition (the "Petition") for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). The Movant is the Debtor and Debtor-in-possession in this Chapter 11 case, and it remains in possession of its assets and properties as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

### Jurisdiction and Venue

2. This Honorable Court has jurisdiction of the subject matter herein and the parties hereto pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105, 363, 541, 1107, related statutes, related rules and various orders of reference. This is a core proceeding.

### Background

3. Ironwood is a subsidiary of Ironwood Holdings, LLC ("Ironwood Holdings"), a related entity to Ironwood Strategic, LLC ("Ironwood Strategic") and a national credit card and payment processing company with principal operations located in Oxford, Mississippi[1]. That's the formal description of the Debtor, but to John H. Lewis ("John") and Dewitt M. Lovelace, Jr. ("Dee"), its owners, it's a way to make a living and provide for their families, as well as Ironwood's

---

[1] Ironwood Holdings, Ironwood Financial and Ironwood Strategic may sometimes be referred to as "Ironwood" when describing the business operation as a whole.

twenty-four other employees who keep the family owned company a thriving enterprise in North Mississippi and beyond.

4. Ironwood acts in a front-end role in the credit card payment processing industry. It arranges payment processing contracts with merchants, sells, installs and maintains program points of sale processing equipment at the merchants' various locations and handles customer service. Although there are many processors, Ironwood's niche is to provide merchants with hands-on and responsive customer service through local representatives, flexible equipment options and straightforward pricing, all of which are fresh and innovative options in the credit card processing industry. Specifically, the term "payment processing" refers to merchants accepting electronic forms of payment. The majority of accepted payments are payments made using credit cards such as Visa, MasterCard, American Express and Discover, in exchange for goods and services, rather than cash. Other forms of "electronic payments" which have emerged over recent years include check conversion, debit, and prepaid, as well as gift and loyalty. In addition to these forms of payment, there are various acceptance methods which include point of sale retail, internet and mobile. Whether a merchant has a physical location or a virtual store front, or sells a physical product or not, merchants are able to offer their customers a wide array of payment options, other than cash, due to the payment processing industry. Ironwood is engaged in the business of offering these various types of payment solutions to its merchant clients.

5. John and Dee, who are life-long friends and Mississippians, previously worked alongside each other as part of a national credit card merchant services company, located in Oxford, Mississippi, exclusively servicing banks. They got back together in 2015 to form Ironwood in order to provide merchants with a fresh, customer-centered, transparent option to process credit card sales. More information regarding Ironwood and its remarkable journey from the casual idea of two friends, to a vibrant economic enterprise, can be found at https://teamironwood.com/ and https://teamironwood.com/wp-content/uploads/2021/04/Ironwood-Story-.pdf.

6. The Debtor's genesis was the 2015 purchase of substantially all of the assets of International Payment Services, LLC ("IPS"). By virtue of that acquisition, Ironwood inherited IPS' role as an Independent Sales Organization ("ISO") which, at the time of the acquisition, involved direct contact with merchants and ground level sales of credit card services. This included credit card machines, and related devices, that give a business the ability to have its customers pay for retail goods with a credit card. Like IPS before it, the business model of Ironwood is to sign merchants to agreements, install the necessary hardware, and manage an account through close and prompt customer support.

7. Removed from direct contact with the merchants is the "credit card processor," such as an entity known as Worldpay (Worldpay's role in this case is described in detail in a moment) in this instance which processes an ISO's merchant customer's many credit card swipes on a daily basis. Even further removed from the ISO in the credit card processing sales model is a bank. A credit card processor such as Worldpay ("Worldpay") must be "sponsored" by a bank which, in this particular instance, is Fifth Third Bank. When an ISO conducts business with a credit card processor a marketing agreement or similar contract is executed between the ISO and the processor. As part of the IPS purchase, Ironwood assumed IPS' marketing agreement with National Processing Company ("NPC") which was subsequently purchased by Vantiv, Inc. ("Vantiv"). Vantiv was then subsequently purchased by Worldpay. Fidelity National Information Services ("FIS"), a Fortune 500 company, acquired Worldpay in July 2019 for approximately $35 billion, and continues to operate as Worldpay. Thus, with IPS' sale and assignment of the Marketing Agreement to Ironwood, the Debtor stands in the shoes of IPS and Worldpay is the ultimate successor to NPC's interests in the Marketing Agreement.

8. Pursuant to the Marketing Agreement (the "Marketing Agreement") between Ironwood and Worldpay, a copy of which is being filed under seal, to be marked as **Exhibit "A"**, Ironwood is paid by Worldpay on a monthly basis after accounting for all credit card transactions

and netting any costs. Every time a credit card is swiped for a purchase, there is a miniscule amount of the total charge that is split between an ISO, the processor and participating bank. An ISO's share of this monthly amount is called the "residual stream" or "residual." Thus, on a monthly basis, Worldpay is obligated to pay Ironwood its residual, based on the amount of credit card processing volume less any costs, fees and other charges allowed by the Marketing Agreement. In turn, Ironwood relies on the residual to service its debt, pay its employees, satisfy its obligations to its merchant clients, and to operate its business.

9. The Marketing Agreement assigned to Ironwood by IPS contains certain indemnity and set-off provisions which Worldpay has claimed purportedly allows it to offset the Debtor's residual when it unilaterally declares an amount is due from the Debtor.

10. This provision came into play when a class action lawsuit was filed against Ironwood, Worldpay[2] and Fifth Third Bank, as well as against IPS, its processor, First Data, and its sponsor bank, Wells Fargo Bank, N.A. ("Wells Fargo"), shortly after John and Dee committed their life savings to purchasing substantially all of IPS' assets via Ironwood. The class action lawsuit, *Wang, et al v. Wells Fargo Bank, N.A., et al*; 1:16-cv-11223 (the "Lawsuit"), filed in the U.S. District Court for the Northern District of Illinois (the "District Court") on December 9, 2016, alleges that Ironwood recorded phone calls to California residents without disclosing that the calls were being

---

[2] At some point after the Lawsuit was filed, Worldpay acquired Vantiv, Inc. ("Vantiv"). Vantiv is the named defendant in the Lawsuit. The processors involved in processing transactions for Ironwood since its acquisition of IPS have been NPS (acquired by Vantiv), Vantiv (acquired by Worldpay), and Worldpay. For purposes of the narrative set forth herein, the processor is referred to as Worldpay.

recorded[3], in violation of the California Invasion of Privacy Act ("CIPA")[4]. The majority of those calls occurred prior to Ironwood's purchase of IPS or shortly thereafter, all without John's and Dee's knowledge that any calls being made by Ironwood to California residents were allegedly in violation of CIPA. When Ironwood acquired the assets of IPS, IPS represented and warranted to Ironwood, as part of that transaction, that IPS' business was being operated in compliance with all applicable laws, in a truly turn-key, lawful operation. Ironwood, at least initially, literally operated the business in the same manner as IPS had operated it for many years, including the recording of the telephone calls that are the subject of the Lawsuit. Ironwood, within one year of its acquisition of IPS, abandoned the cold-call business model that IPS had in place at the time Ironwood acquired IPS. In conjunction with its decision to abandon the IPS business model and to start an entirely new business model, Ironwood closed down its call centers in Utah and Illinois, terminated over one-hundred employees, and moved the business entirely to Oxford, Mississippi, in approximately early 2016. Ultimately, in January 2018, John and Dee decided to restructure the business model to a format with which they were more familiar by virtue of their prior working relationship and experience. At the same time, John and Dee formed Ironwood Holdings and Ironwood Strategic. Ironwood Holdings is the parent to Ironwood and Ironwood Strategic. Ironwood Strategic was formed to carry out the new business model of Ironwood, which primarily focuses on community

---

[3] The purpose of recording the phone calls was to verify that a cold caller made an actual appointment for a sales representative to meet in person with a potential merchant client. Since cold callers were paid, in part, on a commission that was earned when an actual physical appointment was made between an on-the-ground sales person and a potential merchant client, IPS determined that it was necessary to record these calls to verify that its own cold callers were making actual appointments in order to earn their commissions.

[4] The docket in the *Wang* case indicates that there are approximately 23 lawyers from 6 different firms representing the various defendants. The original Complaint in the *Wang* case sought to certify a class on behalf of all individuals or entities present in California whose confidential telephonic communications were recorded by Defendants and all individuals or enttiies present in California whose cellular telephone or cordless telephone communications were recorded by Defendants. Following the filing of Ironwood's Motion to Sever and Transfer, which was based on a contractual provision contained in the merchant services agreement between Ironwood and its merchant clients setting venue for any litigation between those parties exclusively in Lafayette County, Mississippi, an Amended Complaint was filed which abandoned any efforts to certify a class for those who actually signed a contract with Ironwood and instead sought certification of a class comprised of all businesses who received a telemarketing call from Ironwood on a landline telephone or a wireless telephone in California and who did not sign a contract with Ironwood.

banks, universities and other strategic partnerships, all of which are sold and serviced by Ironwood Strategic, under the umbrella of Ironwood Holdings. Ironwood Strategic approached Worldpay (then Vantiv) about a separate processing agreement to place the "new" Ironwood Strategic business with Worldpay. That arrangement would have been governed by a separate marketing agreement between Ironwood Strategic and Worldpay. However, Worldpay (then Vantiv) declined to enter into a separate marketing agreement with Ironwood Strategic. Thereafter, Ironwood validly terminated the Marketing Agreement with Worldpay. However, prior to the effective date of termination of the Marketing Agreement, "new" merchants sold by Ironwood Strategic under the new business model were, by necessity, placed with Worldpay, but only for processing[5]. Following termination of the Worldpay Marketing Agreement, Ironwood Strategic entered into a new agreement with another processor, where all of Ironwood Strategic's business is now placed and processed. The rebranding and model shift to Ironwood Strategic has been well received and praised by Ironwood's customers. Their experiences and other information regarding Ironwood can be accessed by and through the following links: https://youtu.be/dS001pW4iyQ, https://youtu.be/1PFkpYs2yhw, and https://teamironwood.com/.

11.    After the filing of the Lawsuit, Worldpay made a demand for Ironwood to indemnify it, based upon certain provisions of the Marketing Agreement. Because Ironwood and Worldpay (then Vantiv) could not agree upon the meaning and scope of the indemnity provisions of the Marketing Agreement, they ultimately entered into a separate settlement agreement and mutual release ("Indemnity Settlement Agreement") that superseded the indemnity provisions of the Marketing Agreement. The Indemnity Settlement Agreement, an agreement that is critical in this bankruptcy case, contains a confidentiality provision. As such, the Indemnity Settlement Agreement

---

[5] Ironwood internally accounts for the portion of the Worldpay residual that is earned from Ironwood sales and the portion of the Worldpay residual that is earned from Ironwood Strategic Sales, pursuant to a revenue share agreement between the two companies.

is not attached as an exhibit to this Motion, but is separately the subject of the Debtor's Motion to File Agreement Under Seal and for Other Relief **[DK #3]**. Because of the referenced confidentiality provision, the Debtor is reluctant to address the specific terms of the Indemnity Settlement Agreement in this Motion. However, generally speaking, Ironwood agreed, pursuant to certain conditions designed to save costs associated with attorneys' fees, to pay Worldpay's accruing attorneys' fees attributable to its defense of the Lawsuit and agreed to pay any adverse judgment that may be entered against Vantiv (now known as Worldpay). As it turned out, despite the Indemnity Settlement Agreement's goal and intent of reducing defense costs through a joint representation of Ironwood and Worldpay by Ironwood's counsel in the Lawsuit, Worldpay has at all times been separately represented by BakerHostetler ("Baker") in the Lawsuit. To date, Baker has managed to accrue attorneys' fees in excess of $2.1 million dollars in defending Vantiv (now Worldpay) in the class action Lawsuit, in which the District Court has not yet even ruled on the plaintiffs' motion for class certification.

12. Instead of Worldpay paying Baker directly, Worldpay has systematically swept a monthly amount from Ironwood's residual entitlements. Worldpay made its first unilateral sweep of Ironwood's monthly residual on May 14, 2019, when it withheld $100,000. Worldpay made the same $100,000 monthly withdrawal from Ironwood's residual for the next fifteen consecutive months, except there were at least two months when no residuals were taken by Worldpay. While Worldpay's withdrawals did not exceed $100,000 in October and November, Worldpay's two most recent withdrawals, $187,642.19 in March 2021 and $201,093.66 in April 2021, far exceeded the previous monthly withdrawals of $100,000. Importantly, Ironwood has consistently objected to Worldpay's unilateral sweep of its residual, as Worldpay's draconian offsets have been devastating to Ironwood's operation and its ability to grow and remain viable. A copy of correspondence from Ironwood's counsel to Vantiv's counsel, which is but one example of Ironwood's objection to any withdrawals from its residual, is attached, incorporated by reference and marked as **Exhibit "B"**.

A spreadsheet reflecting all of Worldpay's withdrawals from Ironwood's residual is attached, incorporated by reference and marked as **Exhibit "C"**.

13. In addition to the staggering sum of attorneys' fees Ironwood has been forced to pay to Baker through Worldpay's monthly unilateral withdrawals from the Ironwood residual, Ironwood has of course had to pay its own Chicago law firm substantial sums, albeit nowhere near the amount of Baker's fees, to defend its interests in the class action Lawsuit.

14. While all parties await the District Court's decision regarding class certification, attorneys' fees continue to accrue at an astonishing rate while Ironwood's financial lifeline, the residual, continues to be mercilessly swept by Worldpay in ever increasing amounts. There is no end in sight for the Lawsuit. The perceived exposure to all the defendants in the Lawsuit, including the Debtor, is underscored by, among other factors, mediation having failed on March 16, 2021. The plaintiffs claim entitlement to billions of dollars in statutory damages under CIPA. The Wang plaintiffs contend CIPA authorizes fines of $5,000 per violation, even if a call recipient sustains no actual damages. Meanwhile, Worldpay continues to choke the Debtor's viability by monthly sweeps of the Debtor's financial lifeline - its residual. As noted, in both March and April 2021, Worldpay withheld large sums in order to pay Baker's staggering monthly attorneys' fees for defending Worldpay in the Lawsuit. Specifically, in March 2021, Worldpay swept $187,642.19 from Ironwood's residual in order to pay Baker's purported February 2021 attorneys' fees. In April 2021, Worldpay swept $201,093.66 in order to pay Baker's purported March 2021 attorneys' fees. Worldpay's latest residual sweep, $201,093.66 on April 15, 2021, was made on the heels of a meeting with Worldpay representatives requested by John and Dee in a good faith effort to work out an arrangement which would avoid the filing of this case. Given the close proximity of that meeting and Worldpay's sweep, it's apparent that Worldpay came to the table with no real intent or interest in reaching a viable resolution to avoid the April 2021 sweep, but to simply pacify Ironwood's owners' request, while affording Worldpay the opportunity of another sweep of the Debtor's money.

To illustrate the devastating impact of the residual sweeps being made by Worldpay, Ironwood's total net residual for March 2021, was $187,642.19, every cent of which was withheld by Worldpay, leaving Ironwood with no residual income from its Worldpay residual for that month. In April 2021, Ironwood's net residual, absent a Worldpay offset, was $309,746.24, of which $201,093.66 was withheld by Worldpay, leaving Ironwood but $108,652.58 from its Worldpay residual income, an amount that is simply insufficient to continue to sustain its business operation in the future.

15. But for these events, Ironwood would have no reason to seek this Court's safe harbor at this time. However, without this Court's relief and statutory tool kit that can limit or stop Worldpay's relentless raid of corporate earnings, Ironwood will be unable to keep its doors open and make payroll for its many employees. Thus, Worldpay's actions and the ongoing Lawsuit literally jeopardize the financial lives of many families. As such, Ironwood has nowhere else to turn other than to seek this Court's protection and intervention to save an otherwise thriving and viable industry in North Mississippi…not to mention John's and Dee's vision of something that is sustaining for other families.

### **The Debtor's Secured Debt in Connection with the Use of Cash Collateral**

16. Prior to the filing of the Petition, the Debtor borrowed money from BankPlus (the "Lender"). The Lender apparently received liens and security interests in and upon the Debtor's accounts, account proceeds and (perhaps) contract rights as well as other items of collateral (the "Collateral"). For purposes of the Motion, the Debtor assumes that BankPlus is a properly perfected secured creditor in and to accounts, accounts receivable, account proceeds, contract rights/receivables and cash generated from the collection of those items of Collateral. However, the Debtor reserves the right to review and examine the documents and the transaction history with BankPlus to determine, at a later date, if it is a properly perfected secured creditor.

17. In addition, as previously stated, Worldpay has been directing the payment of residuals away from the Debtor to itself, acting apparently under an agreement that was entered pre-

petition. Morever, Worldpay and BankPlus have entered into an inter-creditor agreement whereby BankPlus purportedly subordinated its security interest in accounts, and the cash proceeds thereof, to claims of Worldpay.

18. Worldpay may assert that it has an interest in cash collateral, or, in the alternative, it may assert that it has an interest in property of the estate which "trumps" the purported secured claims of BankPlus. In either event, Debtor seeks authority of the Court to use cash collateral and/or property of the estate (that is cash) pursuant to the Motion.

19. Debtor seeks to retain its cash management system for the purposes of this bankruptcy case and will be filing a motion to accomplish that request shortly.

### Adequate Protection and Uses of Cash Collateral

20. Debtor is in urgent need of the use of cash collateral (assuming the cash Debtor receives post-petition is cash collateral of some party or parties) or, in the alternative, Debtor is in urgent need of the use of cash/property of the estate in order to pay its operating expenses, payroll and other costs of operation. Attached, incorporated by reference and marked as **Exhibit "D"**, is a budget from May 3, 2021, through August 27, 2021. The expense items of the budget are for absolutely essential costs to provide operating expenses, payroll and other expenses and to prevent irreparable harm through its revenue and expense sharing and allocation arrangements. The automatic stay protects the residuals from further diversion by Worldpay.

21. Debtor is informed and believes, and on information and belief alleges, that BankPlus holds additional collateral in addition to the Collateral pledged to it by the Debtor. As a result, the Debtor proposes to provide adequate protection to the Lender by continuing to remain in business, create accounts receivable and collect accounts receivable, and operating in the ordinary course of business. As adequate protection, the Debtor proposes to grant post-petition liens to the Lender upon the same Collateral that it held security interests in before this case was filed. As further adequate protection, for the Lender, to the extent of any diminution of the value of the Collateral from and

after the Petition Date for the Debtor's use thereof, the Lender shall receive a replacement first priority perfected security interest pursuant to § 361(2) of the Bankruptcy Code in all collateral generated post petition as to which the Lender held properly perfected liens and security interests on the Petition Date and to the extent that such stay, use, sale, lease or grant results in a decrease of the value of such entity's interest in such property from the Petition Date.

22. The Debtor believes the value of the Collateral, and other "non-Debtor" collateral, pledged to the Lender exceeds the amount of the Lender's indebtedness, under current conditions. The Lender's equity cushion in the entirety of all its collateral also provides the Lender with adequate protection, in the interim, while the Debtor and the Lender negotiate possible post-petition financing.

23. With respect to the interests of Worldpay, Debtor intends to reject the agreement under which Worldpay asserts its right to divert the residuals from the Debtor to Worldpay. In the meantime, whatever interest Worldpay may have in cash collateral/cash, is adequately protected by the Debtor's continuing to remain in business, to collect the residuals and to operate in the ordinary course. To the extent Worldpay holds claims and interests in and to the Debtor's cash collateral/cash, the value of its interest will be maintained by the Debtor's remaining in business and utilizing cash collateral/cash to operate its business.

### Argument and Authorization

24. The Debtor is unable in the ordinary course of business or otherwise, to obtain unsecured credit allowable pursuant to section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to sections 363 or 364(a) or (b) of the Bankruptcy Code in an amount necessary for the maintenance and preservation of assets and operation of business, or secured indebtedness pursuant to section 364(c) of the Bankruptcy Code.

25. Good cause exists for the entry of an order granting the Motion. Among other things, entry of an Order will minimize the disruption of the operation of the existing business, will maintain

the value of the Debtor's Collateral, and is in the best interests of the Debtor, its creditors and other parties-in-interest.

26. The terms of the use of cash collateral outlined herein are for reasonably equivalent value and fair consideration.

27. A debtor's use of property of the estate is governed by Bankruptcy Code 363. Section 363(c)(1) provides that a debtor-in-possession may use property of the estate in the ordinary course of business without notice or a hearing. 11 U.S.C. § 363(c)(1), Section 363(c)(2), however, permits a debtor-in-possession to use, sell or lease "cash collateral" under subsection (c)(1) only if the entity with an interest in the cash collateral consents or the Court authorizes such use. 11 U.S.C. § 363(c)(2). Debtor has sought consensual use of cash collateral but has not yet received a final response. Whether such use may be authorized by a court depends on whether there is adequate protection of the entity's interest in the cash collateral. Section 361 of the Bankruptcy Code does not provide a definition of adequate protection. However, it is clear that under case law considering adequate protection in similar circumstances, the Lender is adequately protected in this case.

28. The Bankruptcy Code protects a secured creditor only to the extent that a debtor's use of the collateral will result in a decrease in "the value of such entity's interest in such property." 11 U.S.C. §§ 361, 363(e); *see United Savs. Ass'n v. Timbers of lnwood Forest Ass'n Ltd.,* 484 U.S. 365, 369-73, 108 S. Ct. 626 (1988) ("Timbers") (Supreme Court holds that the "interest in property" entitled to protection is "the value of the collateral, as of the time of the commencement of the bankruptcy case" that secures such claim). *See also Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources,* Inc.) 54 F.3d 722, 730 (11th Cir.). *cert. denied* 116 S. Ct. 488 (1995). Here, the interests of the Lender are adequately protected by the agreement to use cash collateral that is only devoted to the needs of the Debtor, maintenance of the status quo with respect to the Collateral and the Lender's equity cushion therein.

29. In addition, the Lender is adequately protected by the Debtor's maintaining the value of the existing business as much as is possible, which will preserve the value of the collateral securing the claims of the Lender. Similarly, whatever interest Worldpay has in cash collateral/cash will be adequately protected (or maintained) by the Debtor's maintaining the value of the existing business as much as possible, which will preserve value throughout, including in cash collateral/cash.

30. The orderly continuation of the business will help to preserve the value of the enterprise and its assets.

31. Applying the foregoing, courts have often allowed the use of cash collateral where such use would enhance or preserve the debtor's reorganization value. Thus, for example, in *Stein v. United States Farmers Home Administration (In re Stein),* 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was undersecured, finding that the use of cash collateral was necessary to the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]". *Id.* At 19 B.R. 460; *see also Dynaco,* 162 B.R. at 396 (finding that the alternative to the debtor's use of cash collateral, a forced termination of his business, would doom reorganization and any chance to maximize value for all creditors): *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on post-petition property acquired by debtor; the debtor can use cash collateral "in the normal operation of their business").

32. If the Debtor is denied the use of cash collateral, in all likelihood it will be forced to make drastic decisions regarding the closing of operations. Such a cessation, even temporarily, would cause the Debtor significant losses with respect to the value of its assets. It may also result in a forced liquidation of all of the Debtor's assets, and a consequent loss to creditors of value. The Debtor's assets (especially its accounts receivable) would be worth substantially less in a forced liquidation setting.

**Notice**

33.   Notice of this Motion is being to (i) the known relevant secured parties (the Lender), (ii) Worldpay, (iii) governmental entities, (iv) the United States Trustee, and (v) persons having entered an appearance in the case, by telephone and by ECF filing and/or by email transmission in accordance with the Court's instructions. The Debtor submits that notice is appropriate and proper under the circumstances and that no further notice is required.

34.   An emergency hearing on this Motion is necessary and essential for the continued operations of the Debtor. The Court should permit this Motion to go forward on an expedited basis and shorten notice of such hearing under the Federal Rules of Bankruptcy Procedure. The Debtor submits that such notice would be appropriate and proper under the circumstances and that no further notice would be required.

35.   Other grounds to be assigned upon a hearing hereof.

WHEREFORE, PREMISES CONSIDERED the Debtor respectfully prays that upon a hearing hereof this Honorable Court will enter its order granting, on an interim basis, the Motion and then, upon a final hearing, the Court will enter its order granting the Motion on a final basis. The Debtor prays for general relief.

THIS, the 4th day of May, 2021.

Respectfully submitted,

IRONWOOD FINANCIAL, LLC

By Its Attorneys,

LAW OFFICES OF CRAIG M. GENO, PLLC

By: _____
Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
LAW OFFICES OF CRAIG M. GENO, PLLC
587 Highland Colony Parkway
Ridgeland, MS 39157
601-427-0048 - Telephone
601-427-0050 - Facsimile
cmgeno@cmgenolaw.com

-and-

James P. Wilson, Jr.; MSB No. 10783
Mitchell, McNutt & Sams, P.A.
215 5th Street North
P.O. Box 1366
Columbus, MS 39703
662-245-5123 - Telephone
662-328-8035 - Facsimile
jwilson@mitchellmcnutt.com

-and-

D. Andrew Phillips; MSB No. 8509
Mitchell, McNutt & Sams, P.A.
1216 Van Buren
P.O. Box 947
Oxford, MS 38655
662-234-4845 - Telephone
662-234-9071 - Faxsimile
aphillips@mitchellmcnutt.com

N:\Firm Data\Users\Bankrupt\Ironwood Financial, LLC\Pleadings\Em Mot to Use CC 5-3-21.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via email transmission and/or Notice of Electronic Filing, a true and correct copy of the above and foregoing instrument to:

Sammye S. Tharp, Esq.
Office of the United States Trustee
sammye.s.tharp@usdoj.gov

THIS, the 4th day of May, 2021.

_____
Craig M. Geno

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI**

IN RE:     IRONWOOD FINANCIAL, LLC     CHAPTER 11
            Debtor     CASE NO. 21-10866-JDW

# EXHIBIT "A"

**EXHIBIT "A" IS BEING FILED UNDER SEAL AND IS NOT ATTACHED HERE.**

**Jim Wilson**

---

**From:** Jim Figliulo <JFigliulo@fslegal.com>
**Sent:** Monday, September 16, 2019 9:21 AM
**To:** Dettmer Slye, Carrie; Tzanetopoulos, George J.
**Cc:** Lauren Catlin
**Subject:** Ironwood's objections to Vantiv's fees and unauthorized taking of funds

Carrie and George,

I have expressed concern about the fees being charged to Ironwood by your firm, which we need to discuss. Importantly, Ironwood expressly objects to the taking of funds that belong to Vantiv to pay your fees. You and Vantiv do not have authority to continue taking $100,000, or any other amount from any fund or account holding money belonging to Ironwood to which you or Vantiv has access. We need to review the entire issue of fees and come to an understanding. Until we do so, you cannot take any funds otherwise due Ironwood to pay your fees.

Please call me to discuss this issue further.

Thanks,

Jim

James R Figliulo
Figliulo & Silverman PC
Suite 3600
10 S LaSalle
Chicago IL 60603

312-251-5262

Jfigliulo@fslegal.com



The contents of this e-mail message and any attachments are intended solely for the addressee(s) named in this message. This communication is intended to be and to remain confidential and may be subject to applicable attorney/client and/or work product privileges. If you are not the intended recipient of this message, or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and its attachments. Do not deliver, distribute or copy this message and/or any attachments and if you are not the intended recipient, do not disclose the contents or take any action in reliance upon the information contained in the communication or any attachments.

# EXHIBIT "B"

| Activity Month | Payment Month | Gross Residual | Fee Rebates and o/ adjustments | Net Residual | Invoice Date | Legal Witheld | Amount Received |
|---|---|---|---|---|---|---|---|
| Apr-19 | May-19 | 324,180.20 | 3,504.31 | 320,675.89 | 5/15/2019 | 100,000.00 | 220,675.89 |
| May-19 | Jun-19 | 333,359.12 | 896.16 | 332,462.96 | 6/17/2019 | 100,000.00 | 232,462.96 |
| Jun-19 | Jul-19 | 304,748.54 | 261.96 | 304,486.58 | 7/16/2019 | 100,000.00 | 204,486.58 |
| Jul-19 | Aug-19 | 293,551.40 | 166.53 | 293,384.87 | 8/15/2019 | 100,000.00 | 193,384.87 |
| Aug-19 | Sep-19 | 307,755.20 | 367.11 | 307,388.09 | 9/17/2019 | 100,000.00 | 207,388.09 |
| Sep-19 | Oct-19 | 275,250.50 | 752.01 | 274,498.49 | 10/16/2019 | 100,000.00 | 174,498.49 |
| Oct-19 | Nov-19 | 268,189.28 | 1,229.43 | 266,959.85 | 11/15/2019 | 100,000.00 | 166,959.85 |
| Nov-19 | Dec-19 | 253,894.25 | 326.00 | 253,568.25 | 12/17/2019 | 100,000.00 | 153,568.25 |
| Dec-19 | Jan-20 | 250,360.37 | 817.43 | 249,542.94 | 1/15/2020 | 100,000.00 | 149,542.94 |
| Jan-20 | Feb-20 | 241,080.72 | 495.56 | 240,585.16 | 2/17/2020 | 100,000.00 | 140,585.16 |
| Feb-20 | Mar-20 | 236,004.26 | 296.15 | 235,708.11 | 3/17/2020 | 100,000.00 | 135,708.11 |
| Mar-20 | Apr-20 | 312,764.66 | 143.99 | 312,620.67 | 4/14/2020 | 100,000.00 | 212,620.67 |
| Apr-20 | May-20 | 182,932.99 | 1,022.80 | 181,910.19 | 5/14/2020 | 100,000.00 | 81,910.19 |
| May-20 | Jun-20 | 223,527.68 | 1,262.09 | 222,265.59 | 6/16/2020 | 100,000.00 | 122,265.59 |
| Jun-20 | Jul-20 | 241,043.83 | 427.97 | 240,615.86 | 7/14/2020 | 100,000.00 | 140,615.86 |
| Jul-20 | Aug-20 | 239,382.48 | 359.61 | 239,022.87 | 8/14/2020 | 100,000.00 | 139,022.87 |
| Aug-20 | Sep-20 | 237,815.97 | 381.79 | 237,434.18 | 9/15/2020 | 20,610.63 | 216,823.55 |
| Sep-20 | Oct-20 | 219,169.62 | 352.61 | 218,817.01 | | - | 218,817.01 |
| Oct-20 | Nov-20 | 223,923.68 | 2,543.62 | 221,380.06 | 11/16/2020 | 22,120.03 | 199,260.03 |
| Nov-20 | Dec-20 | 211,371.69 | 1,123.22 | 210,248.47 | 12/15/2020 | 63,903.53 | 146,344.94 |
| Dec-20 | Jan-21 | 199,572.57 | 835.85 | 198,736.72 | | - | 198,736.72 |
| Jan-21 | Feb-21 | 199,220.76 | 249.00 | 198,971.76 | 2/16/2021 | 61,838.00 | 137,133.76 |
| Feb-21 | Mar-21 | 188,546.47 | 904.28 | 187,642.19 | 3/16/2021 | 187,642.19 | - |
| Mar-21 | Apr-21 | 309,785.24 | 39.00 | 309,746.24 | 4/14/2021 | 201,093.66 | 108,652.58 |
| Totals | | 6,077,431.48 | 18,758.48 | 6,058,673.00 | | 2,157,208.04 | 3,901,464.96 |

# EXHIBIT "C"

Ironwood Financial LLC

Weekly Budget — Ironwood Holdings Overhead Allocations

| | Net Revenue | Commissions Expense | Equipment Expense | Payroll Expenses | Health Insurance | Insurance | Accounting | Rent | Other Overhead | Weekly Cash | Net Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|
| May 3-7 | | | $ 500 | | | | | | | $ (500) | $ (500) |
| May 10-14 | | | $ 500 | $ 18,338 | | | | | | $ (18,838) | $ (19,338) |
| May 17-21 | $ 190,000 | | $ 500 | | | | | | | $ 189,500 | $ 170,162 |
| May 24-28 | | $ 8,000 | $ 500 | $ 43,596 | $ 3,925 | $ 1,275 | $ 1,500 | $ 806 | $ 7,201 | $ (66,804) | $ 103,359 |
| May 31-Jun 4 | | | $ 500 | | | | | | | $ (500) | $ 102,859 |
| Jun 7-11 | | | $ 500 | $ 18,338 | | | | | | $ (18,838) | $ 84,021 |
| Jun 14-18 | $ 185,000 | | $ 500 | | | | | | | $ 184,500 | $ 268,521 |
| Jun 21-25 | | $ 8,000 | $ 500 | $ 43,596 | $ 3,925 | $ 1,275 | $ 1,500 | $ 806 | $ 7,201 | $ (66,804) | $ 201,717 |
| Jun 28-Jul 2 | | | $ 500 | | | | | | | $ (500) | $ 201,217 |
| Jul 5-9 | | | $ 500 | | | | | | | $ (500) | $ 200,717 |
| Jul 12-16 | | | $ 500 | $ 18,338 | | | | | | $ (18,838) | $ 181,880 |
| Jul 19-23 | $ 180,000 | | $ 500 | | | | | | | $ 179,500 | $ 361,380 |
| Jul 26-30 | | $ 8,000 | $ 500 | $ 43,596 | $ 3,925 | $ 1,275 | $ 1,500 | $ 806 | $ 7,201 | $ (66,804) | $ 294,576 |
| Aug 2-6 | | | $ 500 | | | | | | | $ (500) | $ 294,076 |
| Aug 9-13 | | | $ 500 | $ 18,338 | | | | | | $ (18,838) | $ 275,239 |
| Aug 16-20 | $ 200,000 | | $ 500 | | | | | | | $ 199,500 | $ 474,739 |
| Aug 23-27 | | $ 8,000 | $ 500 | $ 43,596 | $ 3,925 | $ 1,275 | $ 1,500 | $ 806 | $ 7,201 | $ (66,804) | $ 407,935 |

# EXHIBIT "D"

| Expense | Monthy Allocation | Weekly Allocation | |
|---|---:|---:|---|
| Owner's Salaries | $ 25,258.33 | $ 5,816.06 | once at end |
| Customer Services | $ 5,683.93 | $ 1,308.80 | twice |
| Admin Salaries | $ 4,397.92 | $ 1,012.68 | twice |
| Management Salaries | $ 17,012.50 | $ 3,917.35 | twice |
| Other Payroll | $ 400.00 | $ 92.11 | |
| PTO | $ 450.00 | $ 103.62 | twice |
| Payroll Taxes | $ 4,365.43 | $ 1,005.20 | twice |
| Health Insurance | $ 3,925.00 | $ 903.78 | once at beg |
| Accounting | $ 1,500.00 | $ 345.39 | |
| Bank Charges | $ 50.00 | $ 11.51 | |
| Dues | $ 240.00 | $ 55.26 | |
| Fuel | $ - | $ - | |
| Health Insurance | $ - | $ - | |
| Information Tech | $ 750.00 | $ 172.70 | |
| Directors & Officers | $ 293.38 | $ 67.55 | |
| E&O/ Cyber | $ 472.79 | $ 108.87 | |
| General Liability & Umbrella | $ 81.84 | $ 18.84 | |
| Workers Comp Insurance | $ 325.00 | $ 74.84 | |
| Insurance - Other | $ 102.19 | $ 23.53 | |
| IRIS | $ 1,157.50 | $ 266.53 | |
| Maintenance | $ 175.00 | $ 40.30 | |
| Meals and Ent | $ 1,350.00 | $ 310.86 | |
| Office Expenses | $ 295.00 | $ 67.93 | |
| Postage | $ 15.43 | $ 3.55 | |
| Rent | $ 806.28 | $ 185.66 | All at beginning |
| Subscriptions | $ 595.00 | $ 137.01 | |
| Telephone | $ 1,025.00 | $ 236.02 | |
| Travel | $ 1,422.85 | $ 327.63 | |
| Utilities | $ 125.48 | $ 28.89 | |
| Total | $ 72,275.85 | $ 16,642.46 | |